[Civil No. 3256. Filed July 1, 1933.]

[23 Pac. (2d) 563.]

THE FEDERAL LAND BANK OF BERKELEY, a Corporation, Appellant, v. SAMUEL S. WARNER, Also Known as S. S. WARNER, and LYDIA S. WARNER, His Wife, Appellees.

202

Messrs. Phillips, Holzworth & Phillips (Mr. Richard W. Young, of Counsel), for Appellant.

Messrs. Woolf & Carter, for Appellees.

Messrs. Sanders, Childs, Bobb & Wescott, Mr. Everett Sanders, Mr. Edward F. Howrey, Mr. Peyton R. Evans and Mr. John Thorpe, *Amici Curiae*.

ROSS, C. J.—The plaintiff, the Federal Land Bank of Berkeley, on November 1, 1922, loaned the Warners, husband and wife, $7,200 on their note indorsed by the Salt River Valley National Farm Loan Association, a corporation, and secured by a realty mortgage on lands situate in Maricopa county. The defendant mortgagors defaulted in the payments, also in keeping the taxes, water dues, and insurance paid; hence this suit was brought to collect the note and foreclose the mortgage. The only defense was a claim to a set-off of $360. This the court allowed. The court also refused to allow the plaintiff an at-

torney's fee as stipulated in the mortgage. Plaintiff has appealed, assigning as reasons therefor the allowance of the set-off and the refusal to allow an attorney's fee. We will consider these assignments in the order given.

It appears from the pleadings that the defendants (Warners), through the Salt River Valley National Farm Loan Association, applied to the Federal Land Bank of Berkeley for a loan, and that under instructions from them to the bank the latter paid the $7,200 borrowed from it as follows: $6,840 on defendants' existing debts and $360, or 5 per cent. of loan, for borrowers' membership stock in the Salt River Valley National Farm Loan Association. It is asserted by defendants that, because this $360 membership fee in the association was used by the association in buying for itself an equal amount of the capital stock of the bank, they should be given credit therefor.

The plaintiff and the Salt River Valley National Farm Loan Association, to which we shall refer, respectively, as the bank and the association, were organized under and pursuant to the terms and conditions of the Federal Farm Loan Act, passed by Congress July 17, 1916. Chapter 245, 39 Stat. 360, title 12 U. S. C. A., § 641 et seq. (Our references will be to U. S. C. A.) Both these corporations derive their charters and charter powers from said act. They are very essential parts of the machinery devised by the Congress for the administration of a nation-wide system of farm loans proposed to be set up thereby. This system consists of twelve federal land banks for the United States, one for each of the twelve districts into which the country has been divided. The plaintiff's district is the eleventh, composed of Arizona, California, Nevada and Utah. Each of these twelve banks is supplied with ample funds to lend the farmer who shows himself qualified to borrow. These funds are obtained by sale of

the bank's capital stock, amounting to $750,000, to national farm loan associations and the government principally (sections 691, 692); and by the sale of farm loan bonds issued against first mortgages (sections 851–874).

The banks are authorized to make loans on the security of first mortgages on lands lying within their respective districts, such loans to be repaid by means of a fixed number of annual or semi-annual payments sufficient to retire the debt within an agreed period of not less than five, nor more than forty, years. The negotiations for loans are not carried on between the bank and the borrower but between the bank and a local farmers' association representing the borrower. Ten or more natural persons who are the owners, or who are about to become the owners, of farm land qualified as security for a mortgage loan, may unite to form one of these local associations, and, if their application is satisfactory, the Federal Farm Loan Board will grant them a charter (sections 716–720).

These associations are distinct, separate, legal entities. They have a board of directors, a president, a vice-president, and a loan committee, and a secretary-treasurer, who is the chief executive officer. They may contract debts and obligations, sue and be sued. One of the conditions of obtaining loans is that the association shall subscribe to the capital stock of the bank 5 per cent. of the aggregate loans to its members, and pay the same in cash when the loans are made (section 721). It shall also leave said capital stock with the bank as collateral security for the payment of loans. Upon full payment of mortgage loans, this stock shall be paid off and retired. The farmer who obtains a loan from the bank through his association must subscribe 5 per cent. of his loan in the capital stock of his association and pay the same in cash (section 733). This capital stock the

association is authorized to hold as collateral security for the payment of loan. Upon full payment of loan, the stock shall be paid off at par and retired.

Thus it is seen that the borrower is a stockholder in his association, and that his association in turn is a stockholder in the bank. The borrower is not a stockholder in the bank. The relation he and the bank sustain to each other is that of debtor and creditor, and, of course, what he owes the bank cannot be reduced by what the association owes him or may owe him upon a settlement. The debts are not between the same persons or corporations or their assigns—an essential to the right of set-off or counterclaim.

Not only the association is obligated to the payment of the mortgage loan to the bank but all the members of the association are "individually responsible, equally and ratably, and not one for another, for all contracts, debts, and engagements of such association to the extent of the amount of stock owned by them at the par value thereof, in addition to the amount paid in and represented by their shares." Section 744.

Until the borrower redeems his membership stock in the association by the discharge of the mortgage debt, he certainly has no right to have such stock, or a credit for it. Before he can claim such shares, he must discharge the debt for the payment of which they were pledged. To the extent of their value, equity will hold and apply the borrower's shares on the debts of the association and the double liability of his fellow stockholders in the association.

The rights of a borrower under the act in the stock of the bank subscribed for by a national farm loan association were involved in *Byrne* v. *Federal Land Bank of St. Paul,* 61 N. D. 265, 237 N. W. 797, and it was there held that the borrower had no interest in

said stock, that it was an asset of the association, and could be applied by the bank upon what the association owed it, and that the bank's relation to the borrower was that of a creditor only. That this is the correct view we have no doubt. See, also, *Gantt* v. *Gunter*, 225 Ala. 679, 145 So. 146.

The mortgage contained the following provision:

"(10) That in case of institution of suit to foreclose this mortgage, the mortgagors shall pay, as a part of the debt hereby secured, all costs and legal expense and reasonable attorney's fee to be fixed by the Court, and that said attorney's fee is and shall be a lien upon said premises and secured by this mortgage. . . . "

The plaintiff asked for $125 as a reasonable attorney's fee. We think, unless the act under which this system of borrowing is authorized either expressly or impliedly forbids the lender from collecting a reasonable attorney's fee for foreclosure, under the decisions and practice in this jurisdiction the contract is enforceable and plaintiff is entitled to a reasonable attorney's fee. We have frequently recognized and enforced contracts to pay attorneys' fees in foreclosure proceedings. *O. S. Stapley Co.* v. *Rogers,* 25 Ariz. 308, 216 Pac. 1072; *Maxey* v. *Somerton State Bank,* 22 Ariz. 371, 197 Pac. 894; *Estate of Amirault,* 22 Ariz. 122, 194 Pac. 1099; *McClintock* v. *Bolton,* 6 Ariz. 370, 57 Pac. 611. In this respect we are in line with the great majority of the courts. 41 C. J. 415, § 264. Attorneys' fees are not costs because they are not provided for or fixed by law. They are the result of contract between the parties whereby, in consideration of the mortgage loan, the mortgagor agrees to repay the principal, interest, etc., and, in case suit is brought to collect, to pay the mortgagee a reasonable attorney's fee. In other words, the mortgagor assures the mortgagee that he

will be put to no outlay for attorney's fees in collecting his debt.

Section 3840, Revised Code of 1928, reads as follows:

"Judgments for the foreclosure of mortgages and other liens shall be that the plaintiff recover his debt, damages and costs, with a foreclosure of the plaintiff's lien on the property subject thereto. . . . "

Counsel for plaintiff and *amici curiae* argue that the word "damages" is broad enough to include an attorney's fee, and that its association with the words "debt" and "costs" shows that to be its intendment. Just what the word was intended to cover it is difficult to say. It could include taxes, water dues, insurance, or any other outlay the mortgagee is put to to protect his mortgage lien, and it might reasonably include any expenses forced on the mortgagee through default of the mortgagor, such as attorney's fees. At all events, the stipulation in the mortgage to pay an attorney's fee when it was put in there was legal, and is still legal, under the decisions and laws of this state.

While a federal farm loan mortgage is a matter of contract between the parties, incorporated in every such contract are the terms and conditions of the Federal Farm Loan Act. The act is a part of such contract, and controls where there is any conflict between it, the state laws, or the contract. *Scott* v. *Federal Land Bank,* 92 Ind. App. 249, 175 N. E. 16. For instance, if the act forbids the inclusion in the mortgage contract of a stipulation to pay an attorney's fee in case of foreclosure, the stipulation would be unenforceable. The defendants contend that is the situation, whereas plaintiff and the *amici curiae* contend that the limitations of the act on the costs and expenses to be charged and collected from the borrower are those for the administration of the act by

the Federal Farm Loan Board and its different agencies in the process of making the loan and in its collection through such agencies; and that such limitations do not extend to or have anything to do with the expenses of collection when resort is had to the courts.

The question is presented for the first time, and involves the construction of the Federal Farm Loan Act. The language of the act nowhere specifically or directly authorizes the bank to contract for or collect an attorney's fee in case of a foreclosure, nor does it specifically forbid such contract. But that the general policy of the act is to protect the borrower and to limit the expenses incident to his loan to a minimum there can be no doubt. The central thought seems to have been the inauguration of a system of loans for the farmer, under the supervision and control of the national government, shorn of the penalties, exactions, bonuses, commissions and charges to which he had been theretofore exposed and against which he was helpless to protect himself. Every detail, from the initial application for a loan to the liquidation thereof, is under the control of the Federal Farm Loan Board and its agencies, whose duties and powers are pretty well defined. The principal of such agencies is the lending bank. Section 781 of the act provides that such bank "shall have power— . . ..

"Ninth. . . . To charge applicants for loans and borrowers, under rules and regulations promulgated by the Federal Farm Loan Board, reasonable fees not exceeding the actual cost of appraisal and determination of title. Legal fees and recording charges imposed by law in the State where the land to be mortgaged is located may also be included in the preliminary costs of negotiating mortgage loans. The borrower may pay such fees and charges or he may arrange with the Federal land bank making the loan to advance the same, in which case said expenses

shall be made a part of the face of the loan and paid off in amortization payments. Such addition to the loan shall not be permitted to increase said loan above the limitations provided in section 771.''

Thus there is conferred on the bank the right to collect from the borrower actual costs of appraising his land and determining the title thereof and other specific preliminary costs of the loan. This section limits the bank's charges against the borrower to certain specific items of costs and expenses incurred preliminary to the loan. These are initial costs. The specific grant of authority to collect these initial costs, while exclusive as to them, does not necessarily carry a denial of authority in the bank to collect from the borrower other costs or costs incident to the protection of the mortgage or its collection.

But, after stating what the bank may charge to the borrower, the act undertakes to state what may not be charged to him, and the language used for that purpose is very sweeping. It could not be more so. It says, in effect, that *the bank is without power to demand or receive, under any form or pretext, any commission or charge not specifically authorized in the act.* Subdivision 5, § 791. If plaintiff's position is sustained, it will have both demanded of and received from the borrower an attorney's fee. It makes no difference, however, what it is called if it is a charge or a commission. Its name or form is immaterial, as also the reason it is demanded or received. The main thing is, Is it a commission or a charge? If it is, the bank has no power to demand or receive it. *Speeter* v. *United States,* (C. C. A.) 42 Fed. (2d) 937. No one would contend that an attorney's fee is a *commission,* we apprehend, and it would seem that no one would claim that an attorney's fee is not a *charge.* The word ''charge'' is very much more comprehensive than the word ''commission.' *Commission* ordinarily refers to the com-

pensation paid to an agent or servant for services performed. As we interpret the word "charge" or "charges" as here used, it is intended to cover any *burden* or *exaction* not specifically authorized, demanded or received by the bank from the borrower. Appraisal costs, costs of abstract of title, including a fee for its examination, and costs of recording are classed as "charges" or "fees" in subdivision ninth of section 781, *supra*. They are, except the item for recording, matters of contract, just as attorney's fees are.

Section 983 contains this restriction:

"No land bank . . . shall charge or receive any fee, commission, bonus, gift, or other consideration not herein specifically authorized."

The identical thing forbidden, to wit, a fee, was contracted for in the mortgage, and is now being demanded of the borrower. Such a fee is not "specifically authorized," but is inferentially forbidden by the act.

The matter of penalty for default in making payment when due is not overlooked or ignored. The act (subdivision 9, § 771) provides that, if payments are defaulted, they shall bear 8 per cent. per annum simple interest, and that, if taxes, liens, judgments, or assessments are not paid, the mortgagee may pay them and receive thereon 8 per cent. per annum simple interest. Thus the practice of increasing and compounding the interest on deferred payments, common to mortgages between private loan companies and borrowers, was noticed and impliedly forbidden. Only simple interest may be charged. The reason the provision concerning attorney's fees, common to such mortgages, is not specifically mentioned or noticed is doubtless because the Congress believed such expense was an overhead taken care of under "administration." It would be exceedingly

strange that the Congress should have taken pains to restrict and limit the expenses of the borrower in all the respects to which he had been theretofore exposed except the one of attorney's fees. The Federal Farm Loan Board is empowered and authorized to employ a permanent staff of attorneys, experts, assistants, etc., and to fix their compensation (section 659). The federal land banks have authority to elect their officers and appoint their employees and define their duties (section 676), also to fix their compensation, subject to the approval of the Federal Farm Loan Board (section 683). The failure of the act to specifically authorize the bank to contract with the borrower for an attorney's fee would lead one to believe that the Congress probably intended the bank's permanent staff of attorneys should perform that service.

In addition to the preliminary costs and expenses that may be collected from the borrower, as provided in section 781, *supra,* it is specifically provided in subdivision second of section 771:

"Every such mortgage shall contain an agreement providing for the repayment of the loan on an amortization plan, . . . second, a charge for administration and profits at a rate not exceeding 1 per centum per annum on the unpaid principal, said two rates combined constituting the interest rate on the mortgage. . . . "

This 1 per centum for "administration and profits" the bank is specifically authorized to collect from the borrower. Plaintiff and *amici curiae* would restrict the meaning of the word "administration" to the act of collecting the interest on the mortgage and the amortized payments on the principal so long as they were voluntarily made by the borrower, and stop there. They seem to claim that, when the borrower defaults in his payments, and resort must be had to the courts, *administration* ceases in the sense used in

this act. In other words, that the 1 per centum on the unpaid principal, while covering "profits," does not cover the entire "administration."

The plaintiff and *amici curiae* take the position that this form of contract has been in use by all the different farm banks for some sixteen years, with the authority and approval of the Federal Farm Loan Board; that sections 971–973 of the act make it the duty of the Farm Loan Commissioner to investigate the laws of the states and report to the Board; and the Board is forbidden to make any loans in any state unless the laws "are such as to assure the holder thereof [of mortgage] adequate safeguards against loss in the event of default on loans secured by any such mortgages." Section 971.

For these reasons, they say, the Board's interpretation of the law should be followed, "unless convincing reason to the contrary is found in the language or purpose of the enactment." We agree with this rule of interpretation, but think both the language of the act and its purpose forbid the contract for attorney's fees.

It is also said, if plaintiff is not allowed to collect an attorney's fee, the bank will sustain a "loss," contrary to the manifest intention of sections 971–973. This depends. If the act permits the making of the contract with the mortgagor for an attorney's fee, then the deduction is correct, but, if it forbids such a contract, then nothing is either lost or gained by its rejection.

They also seem to place some sanctity or virtue in the first sentence of section 642, reading as follows:

"Wherever the term 'first mortgage' is used in this chapter it shall be held to include such classes of first liens on farm lands as shall be approved by the Federal Farm Loan Board, and the credit instruments secured thereby."

This language defines a first mortgage, and makes it a prerequisite that it shall be approved by the Federal Farm Loan Board, but we do not understand therefrom that such approval would make legal unauthorized or illegal conditions inserted therein.

We conclude that the cause should be remanded, with directions to modify the judgment by adding thereto the item of $360 allowed as a set-off; and that, as thus modified, the judgment should be affirmed.

McALISTER, J., and FRED W. FICKETT, Superior Judge, concur.

NOTE.—On account of the illness of Judge LOCK-WOOD, Honorable FRED W. FICKETT, Judge of the Superior Court of Pima County, was called to sit in this case.